1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SABRINA IVORY,                          No.  2:12-cv-0991 AC

12              Plaintiff,

13        v.                                  ORDER

14   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,
15
                Defendant.
16

17        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

18   ("Commissioner") denying her application for a period of disability and disability insurance

19   benefits ("DIB") under Title II of the Social Security Act ("the Act"), and Supplemental Security

20   Income ("SSI") under Title XVI of the Act.  The parties' cross-motions for summary judgment

21   are pending.  For the reasons discussed below, the court will deny plaintiff's motion for summary

22   judgment and will grant the Commissioner's motion for summary judgment.

23                        PROCEDURAL BACKGROUND

24        Plaintiff filed an application for DIB and SSI on November 16, 2009, alleging disability

25   beginning on December 10, 2004.  Administrative Record ("AR") 161-69.  Both applications

26   were denied initially on May 25, 2010, and again upon reconsideration on August 25, 2010.  AR

27   115-18.  On February 7, 2011, a hearing was held before administrative law judge ("ALJ")

28   Brenton L. Rogozen.  AR 72-114.  Plaintiff appeared without attorney representation at the

1

hearing, at which she, a witness, a medical expert ("ME"), and a vocational expert ("VE")

testified.  Id.  In a decision dated February 17, 2011, the ALJ determined that plaintiff was not

disabled under sections 216(i), 223(d) of the Act as to her DIB claim and not disabled under

section 1614(a)(3)(A) of the Act as to her SSI claim.[1]  AR 8-16.  The ALJ made the following

findings (citations to 20 C.F.R. omitted):

> 1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.

> 2.  The claimant has not engaged in substantial gainful activity since October 16, 2008, the alleged onset date.

---

[1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq.  This requires determination of whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled.  If not, proceed to step two.

> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

> Step five:  Does the claimant have the residual functional capacity perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

   The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

1

2

3. The claimant has the following severe impairments: hepatitis C and rheumatoid arthritis.

3

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4

5

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6

7

6. The claimant is capable of performing past relevant work as a unit admitting clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

8

9

7. The claimant has not been under a disability, as defined in the Social Security Act, from October 16, 2008, through the date of this decision.

10

11

12    AR 25-40.

13         Following the administrative hearing, plaintiff passed away.  AR 18.  Plaintiff's son,

14    Garrett Jones, substituted in as plaintiff.  AR 152-53.  Plaintiff requested review of the ALJ's

15    decision by the Appeals Council as to plaintiff's DIB claim only.  AR 152.  The Council denied

16    review on February 15, 2012, leaving the ALJ's decision as the final decision of the

17    Commissioner of Social Security.  AR 1-3.

18                                 STATEMENT OF THE FACTS

19         Born on December 16, 1958, plaintiff initially alleged disability beginning on December

20    10, 2004, see AR 161, but revised the onset date at the administrative hearing to October 16,

21    2008, AR 78.  Plaintiff was 49 years old on the revised alleged onset date of disability and 52

22    years old at the time of the administrative hearing.  In her initial application for disability, she

23    asserted the following disabling impairments: psychosis, physical pain, hepatitis C, extreme

24    problems with menopause, rheumatoid arthritis, migraine headaches, insomnia, paranoia, bipolar

25    depression, and anxiety.  AR 204.  Plaintiff has two years of college education, AR 96, 209, and

26    worked as an admitting clerk at the emergency room of a hospital from 1997 to 2004, AR 96,

27    679.  She last worked as a courtesy clerk at Safeway, but was fired on June 12, 2009 for talking

28    on her cellphone during work.  See AR 679.

3

LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "It means such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

DISCUSSION

Plaintiff moves for summary judgment on the grounds that (1) the ALJ erred when he found that plaintiff did not have any mental health impairments that were severe at the second step of the sequential evaluation process and did not have a severe impairment related to her migraine headaches; (2) the ALJ inadequately, inaccurately, and improperly weighed the medical opinions; and, finally, (3) the ALJ improperly discredited plaintiff and her witness.

A.    Step Two of the Sequential Evaluation Process

Plaintiff argues first that the ALJ improperly evaluated plaintiff's impairments at step two of the sequential evaluation and thus failed to find that plaintiff suffered from severe mental impairments and from migraine headaches.

////

4

1        1.      Legal Standards

2        "The step-two inquiry is a de minimis screening device to dispose of groundless claims."

3   Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  The purpose is to identify claimants

4   whose medical impairment is so slight that it is unlikely they would be disabled even if age,

5   education, and experience were taken into account.  Bowen v. Yuckert, 482 U.S. 137, 153 (1987).

6   At step two of the sequential evaluation, the ALJ determines which of claimant's alleged

7   impairments are "severe" within the meaning of 20 C.F.R. § 404.1520(c).  "An impairment is not

8   severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no

9   more than a minimal effect on the ability to do basic work activities.'"  Webb v. Barnhart, 433

10  F.3d 683, 686 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 96–3p (1996)).  The step

11  two severity determination is "merely a threshold determination of whether the claimant is able to

12  perform his past work.  Thus, a finding that a claimant is severe at step two only raises a prima

13  facie case of a disability."  Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007).

14       At the second step, plaintiff has the burden of providing medical evidence of signs,

15  symptoms, and laboratory findings that show that his or her impairments are severe and are

16  expected to last for a continuous period of twelve months.  Ukolov v. Barnhart, 420 F.3d 1002,

17  1004-05 (9th Cir. 2005); see also 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909,

18  416.920(a)(4)(ii).  An ALJ's finding that a claimant is not disabled at step two will be upheld

19  where "there are no medical signs or laboratory findings to substantiate the existence of medically

20  determinable physical or mental impairment."  Ukolov, 420 F.3d at 1005.

21       Pursuant to the analytical procedure prescribed by the regulations, after the ALJ

22  determines that the claimant has a medically determinable mental impairment, he then rates the

23  degree of the claimant's functional limitations in four areas, known as the "B Criteria": (1)

24  activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4)

25  episodes of decompensation.  20 C.F.R. § 1520a(b)-(c); see also Pt. 404, Subpt. P, App. 1, 12.00

26  Mental Disorders.  In the first three areas, the ALJ rates the limitations as either none, mild,

27  moderate, marked, or extreme.  The fourth functional area, episodes of decompensation, is rated

28  on a four point scale of none, one or two, three, and four or more.  20 C.F.R. 404.1520a(c)(3) and

                                                5

1   (4)).  If a severe impairment exists, all medically determinable impairments must be considered in

2   the remaining steps of the sequential analysis.  20 C.F.R. § 404.1523.  The ALJ "must consider

3   the combined effect of all of the claimant's impairments on her ability to function, without regard

4   to whether each alone [i]s sufficiently severe."  Smolen, 80 F.3d at 1290; 20 C.F.R. § 404.1523.

5              2.      The ALJ's Decision

6         The ALJ followed this analytical procedure in this case and determined that plaintiff's

7   mental impairments of psychosis, not otherwise specified, and polysubstance abuse, considered

8   singly and in combination, were medically determinable but were not severe.  Specifically, the

9   ALJ found that plaintiff had mild restrictions in the first three functional areas (activities of daily

10  living, social functioning, and concentration, persistence or pace) and, as to the fourth functional

11  area, no episodes of decompensation.  AR 27-29.  These findings are supported by substantial

12  evidence.

13        With regard to daily activities, the ALJ relied on an adult function report ("AFR")

14  completed by plaintiff, in which she noted no problems with her personal care, which includes

15  dressing, bathing, and feeding herself.  AR 221.  The AFR also reflects that plaintiff does laundry

16  at the shelter, is able to pay bills, is able to handle a savings and checking account, and can count

17  change.  Id. 222-23.

18        As to social functioning, the ALJ relied on the AFR and plaintiff's testimony that she

19  spends time with her boyfriend on a daily basis and that she has no problems getting along with

20  family, friends, neighbors, or others.  AR 103, 224-25.  The ALJ also referred to the reports of

21  two consultative examiners, Dr. J. Chung and Dr. O. Lum.  See AR 28.  Dr. Chung noted that

22  plaintiff was a "pleasant lady," and Dr. Lum opined that plaintiff would have no difficulty

23  accepting instructions from supervisors and interacting with co-workers and the public.  AR 28,

24  690-93, 694-98.

25        Next, with regard to concentration, persistence or pace, the ALJ relied on Dr. Lum's

26  opinion that plaintiff was capable of simple and repetitive as well as detailed tasks; that she could

27  work on a consistent basis with specific instructions to calm her mood; that she could maintain

28  regular attendance without interruptions from her psychiatric condition; and that she could deal

1    with stress in the workplace.  AR 28, 692.  The ALJ gave Dr. Lum's opinion significant weight as

2    consistent with the record as a whole, which supported a finding that plaintiff's drinking and drug

3    use affected her concentration, but that medication and abstinence from alcohol and drugs

4    significantly helped her.  AR 28.

5          Finally, as to periods of decompensation, the ALJ found that plaintiff has experienced no

6    period of decompensation of extended duration.  AR 29.

7          3.    Plaintiff's Mental Health Impairments and Migraine Headaches

8          As noted, at the second step of the sequential evaluation process, the ALJ found the

9    mental impairments of psychosis, not otherwise specified, and polysubstance abuse to be

10   medically determinable.  Plaintiff argues that the ALJ erred by failing to find as medically

11   determinable plaintiff's affective and cognitive disorders and PTSD, as well as her migraine

12   headaches, which are either alluded to or specifically referred to in the record.  See, e.g., Dr. Viet

13   Le's April 15, 2009 Medical Source Statement – Mental (referencing plaintiff's bipolar affective

14   disorder and PTSD), AR 627-28; Dr. Clara Mahan and psychology intern Jennifer Sanchez's

15   December 13, 2009 Neuropsychological Brief Screen Report (referencing plaintiff's "history of

16   bipolar disorder and polysubstance dependence" and making note of plaintiff's "history of

17   psychiatric hospitalizations with brief psychotic episodes and extreme mood lability"), AR 679-

18   89; Dr. Sarah Doorley and Dr. Clara Mahan's February 16, 2010 Letter to the Department of

19   Social Services (concluding that plaintiff's mental condition meets SSI critera for 12.04 Affective

20   disorders), AR 699-704.

21         But even assuming that these impairments were medically determinable, there is no

22   evidence that these impairments, as distinct from bipolar disorder and polysubstance abuse,

23   limited plaintiff's ability to perform work-related activities.  With no evidence showing that these

24   impairments limited her ability to work, the court cannot find that the ALJ erred by not

25   considering these impairments to be medically determinable, let alone severe.  If plaintiff

26   believed that her impairments had an impact on her ability to work, it was her burden to produce

27   evidence supporting her claim.  See Burch, 400 F.3d at 679 ("The claimant carries the initial

28   burden of proving steps one through four of the analysis.").

1    In any event, though the ALJ did not specifically refer to plaintiff's other mental health

2    impairments at the second step of the sequential evaluation process, he did refer to plaintiff's

3    "various psychological related impairments" and her migraine headaches at the subsequent steps.

4    See AR 33, 35-39.  Therefore, any error was harmless.  See Lewis v. Astrue, 498 F.3d 909 (9th

5    Cir. 2007) (concluding that the ALJ's classification of one of claimant's impairments as non-

6    severe at the second step was harmless error because claimant was found to have other severe

7    impairments, and the ALJ extensively discussed claimant's non-severe impairment symptoms in

8    the fourth step).

9                4.        The Second Step as a Gate-Keeping Mechanism

10   Moreover, in arguing that the ALJ erred at the second step by finding certain impairments

11   to be non-severe, plaintiff misunderstands the function of the second step as a gate-keeping

12   mechanism to dispose of groundless claims.  Once a claimant prevails at the second step by

13   achieving a finding of some severe impairment, regardless of which condition is found to be

14   severe, the Commissioner proceeds with the sequential evaluation, considering at each step all

15   other alleged medically determinable impairments that may impact the claimant's ability to work.

16   See 42 U.S.C. § 423(d)(2)(B) ("In determining whether an individual's physical or mental

17   impairment or impairments are of a sufficient medical severity that such impairment or

18   impairments could be the basis of eligibility under this section, the Commissioner of Social

19   Security shall consider the combined effect of all of the individual's impairments without regard

20   to whether any such impairment, if considered separately, would be of such severity.").

21   Here, plaintiff prevailed at the second step.  Therefore, any error in the second step was

22   harmless because the ALJ found two severe medically determinable impairments and continued

23   on with the remaining steps.  See Lewis, 498 F.3d 909 (9th Cir. 2007) (concluding that the ALJ's

24   classification of one of claimant's impairments as non-severe at the second step was harmless

25   error because claimant was found to have other severe impairments, and the ALJ extensively

26   discussed claimant's non-severe impairment symptoms in the fourth step); Smolen v. Chater, 80

27   F.3d 1273, 1290 (9th Cir. 1996) (recognizing that, if one severe impairment exists, all medically

28   determinable impairments must be considered in the remaining steps of the sequential analysis).

1    Thus, the question becomes whether the ALJ properly considered the functional limitations of all

2    medically determinable impairments at the remaining steps.  See Smolen, 80 F.3d at 1290.  As

3    discussed below, the ALJ fully considered all of plaintiff's impairments, including her mental

4    health impairments and migraine headaches, and accommodated in the RFC finding the

5    limitations that were supported by the record.  There was no error in the step two analysis.

6    B.       Treatment of Medical Opinions

7            The ALJ ultimately determined that plaintiff retains the residual functional capacity to

8    perform the full range of light work.  At issue here is whether the ALJ erred when he credited

9    some medical opinions while rejecting others.  As will become apparent, the medical record in

10   this case is voluminous and hardly consistent.  Whereas some medical professionals determined

11   that plaintiff's functional limitations are moderate to severe, others determined that plaintiff's

12   functional limitations are minor.

13           1.       Physical Impairments

14           The undersigned turns first to the ALJ's consideration of plaintiff's physical impairments,

15   which include physical pain, hepatitis C, extreme problems with menopause, rheumatoid arthritis,

16   and migraine headaches.

17           With respect to plaintiff's migraine headaches, the ALJ noted that this impairment was

18   supported by multiple trips to the doctor.  However, the ALJ found it paradoxical that, despite her

19   complaints of chronic headaches (and rheumatoid arthritis), plaintiff was able to ride her bike 6-8

20   miles a day.  AR 30.  Though the record in fact establishes that plaintiff had recently ceased

21   riding her bike such long distances, see AR 694, the court finds this error to be harmless as there

22   exist substantial evidence to ultimately support the ALJ's decision.  See Molina v. Astrue, 674

23   F.3d 1104, 1118 (9th Cir. 2012).

24           As to plaintiff's claim of extreme problems with menopause, the ALJ cited to the record

25   establishing that plaintiff went through menopause nine years prior and that recent physical

26   examinations were completely normal.  AR 30, 532-33, 576-77.

27           As to plaintiff's rheumatoid arthritis, the ALJ considered and then gave limited weight to

28   the opinion of the consultative examiner, Dr. James Luu.  On June 6, 2009, Dr. Luu conducted an

1   internal medicine evaluation of plaintiff, noting that plaintiff's most prominent general finding is

2   her rheumatoid arthritis with swan neck and Bouchard's deformities.  AR 523-27.  Plaintiff

3   assessed her pain level for the rheumatoid arthritis between 8/10 and 10/10.

4       Following the examination and upon review of plaintiff's medical records from Santa

5   Clara Valley Medical Center ("SCVMC"), Dr. Luu provided the following functional assessment:

6   plaintiff can stand and walk for up to two hours; can sit for up to four hours; can lift and carry 20

7   pounds occasionally and 10 pounds frequently due to her rheumatoid arthritis; can climb, balance,

8   stoop, kneel, crouch, and crawl frequently; and can reach, handle, feel, and finger frequently.

9       The ALJ gave limited weight to Dr. Luu's opinion because (1) there is no medical

10   evidence that plaintiff has joint damage from rheumatoid arthritis; (2) plaintiff's complaints of

11   extreme pain are contradicted by the few and inconsistent complaints throughout the treatment

12   records; (3) plaintiff does not take pain medication to treat the pain in her hands even though she

13   rated it at 10/10; (4) plaintiff was not fully candid regarding her substance abuse history; (5) Dr.

14   Luu did not note any limitations with regard to sitting and standing; his own observation was that

15   plaintiff sat comfortably and was able to get on and off the table without any difficulties; (6) Dr.

16   Luu's opinion is inconsistent with the record as a whole and based disproportionately on

17   plaintiff's subjective complaints, which the ALJ found not credible, as discussed more fully infra;

18   and (7) the ME did not agree with Dr. Luu's opinion.

19       The weight given to medical opinions depends in part on whether they are proffered by

20   treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31

21   (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who

22   has a greater opportunity to know and observe the patient as an individual, than the opinion of a

23   non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans

24   v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-

25   examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

26       In addition to considering its source, to evaluate whether the Commissioner properly

27   rejected a medical opinion the court considers whether: (1) contradictory opinions are in the

28   record; and (2) clinical findings support the opinions.  The Commissioner may reject an

1   uncontradicted opinion of a treating or examining medical professional only for "clear and

2   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

3   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

4   by an examining professional's opinion which is supported by different independent clinical

5   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

6   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

7   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

8   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

9   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

10  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

11  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

12  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

13  without other evidence, is insufficient to reject the opinion of a treating or examining

14  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

15  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

16  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see

17  also Magallanes, 881 F.2d at 751.

18        Plaintiff contends that the ALJ's rejection of Dr. Luu's opinion constitutes error, and in

19  support refers to evidence in the record that refutes the reasons articulated by the ALJ.  But she

20  also admits that "the record says many different things."  Pl.'s Mot. Summ. J. 8.  The medical

21  evidence presented perhaps would permit a reasonable mind to give greater weight to Dr. Luu's

22  opinion.  It also would permit a finding that the opinion is entitled to limited weight.  When there

23  is evidence sufficient to support either outcome, we must affirm the decision actually made.  See

24  Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971).  As to the ALJ's statement that Dr. Luu's

25  opinion is inconsistent with the record as a whole, "[t]o simply say a medical opinion is not

26  supported by the medical evidence is a conclusory statement and not an adequate reason to reject

27  the opinion."  Schulz v. Astrue, 849 F. Supp. 2d 1049 (W.D. Wash. 2011) (citing Embrey v.

28  Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)).  But the ALJ did more than that here.  In his

1   decision, the ALJ frequently referenced those portions of the record that contradict the findings

2   made by Dr. Luu.  Thus, the court finds no error with respect to the weight given to Dr. Luu's

3   opinion.

4          Continuing with his analysis of plaintiff's rheumatoid arthritis, the ALJ noted that, while

5   plaintiff claimed that she treated her migraines and knee pain with pain medication, she did not

6   mention taking pain medication to treat any pain in her hands, despite telling Dr. Luu that the pain

7   in her hands was 10/10.  Furthermore, multiple records were cited in which there were either

8   completely normal examinations with no signs of rheumatoid arthritis, no complaints of

9   musculoskeletal-related complaints, and/or no mention of rheumatoid arthritis at all.  See, e.g.,

10   AR 562, 636, 641, 735, 739.

11          On February 13, 2010, plaintiff underwent a comprehensive internal medicine evaluation

12   with consultative examiner Dr. Jaehoon Chung.  AR 694-98.  Plaintiff's chief complaints were

13   hepatitis C, rheumatoid arthritis, emphysema, pulmonary nodules, high blood pressure, and

14   migraine headaches.  Dr. Chung first discussed plaintiff's history of present illness.  He noted that

15   plaintiff was found to have hepatitis C in 1997, underwent treatment in 2004, which she could not

16   tolerate, and is currently being followed by a hepatologist regularly.  As to plaintiff's rheumatoid

17   arthritis, plaintiff was diagnosed in 2004.  She ranked her pain as 6/10 and stated that she feels the

18   pain almost every day.  She claimed that she used to ride a bicycle frequently, but cannot ride

19   anymore due to her pain.  As to emphysema, plaintiff underwent a tomography of the chest

20   around November 2009, which revealed pulmonary nodules with emphysema, but she asserted

21   that she could walk a mile without being short of breath.  Around November 2009, plaintiff was

22   also found to have high blood pressure.

23          Following review of plaintiff's medical history, Dr. Chung addressed plaintiff's daily

24   activities, indicating that she can take care of herself and she last worked at Safeway, but "was

25   fired because of her mental condition."  AR 695.  As to her social history, plaintiff claimed that

26   she smoked a pack a day since the age of 16, she occasionally drinks alcohol, and she had been

27   clean from drugs since March 2009.  Dr. Chung noted that plaintiff was "a very pleasant lady"

28   who could get on and off the examination table by herself without any difficulty.  Following a full

12

1   examination, Dr. Chung noted no evidence of active inflammation in the bilateral hand joints,

2   bilateral knee joints, or bilateral ankle joints.  He also found plaintiff's motor strength to be 5/5 in

3   all four extremities and further found no manipulative limitations.  Dr. Chung's functional

4   assessment is as follows: plaintiff can stand and walk up to six hours, can sit up to 8 hours, and

5   can lift 100 pounds occasionally and 50 pounds frequently.

6        The ALJ gave significant weight to the opinion of Dr. Chung.  AR 32.  First, the ALJ

7   questioned plaintiff's credibility, referencing her statement that she was fired from Safeway due

8   to her mental condition when the record established that she was fired because she was talking on

9   her cell phone during work hours.  See AR 619.  The ALJ also noted that while plaintiff claimed

10  she had been clean from drugs since March 2009, plaintiff did not disclose her marijuana use or

11  her very recent history of drug abuse.  See, e.g., AR 750, 752, 759.  The ALJ then noted that Dr.

12  Chung's examination was completely normal with no evidence of rheumatoid arthritis.  The ALJ

13  gave significant weight to Dr. Chung's opinion because it was more recent than Dr. Luu's report,

14  was better supported, appeared to be based less on plaintiff's subjective complaints and more on

15  the objective clinical findings, and was more consistent with the record as a whole.  AR 32.

16  Nevertheless, the ALJ assessed a more restrictive RFC, giving plaintiff some benefit of the doubt.

17       The ALJ concluded that the medical records do not reveal evidence of any worsening in

18  the plaintiff's condition as to either her headaches or her rheumatoid arthritis.  Despite her

19  complaints of knee pain and headaches, none of the medical professionals referred her for

20  diagnostic testing, evaluation by an orthopedist or rheumatologist, or physical therapy.  While

21  there was evidence in the record of an elevated liver test, this coincided with the period in which

22  plaintiff acknowledged that she relapsed to drinking.  See AR 923.  The ALJ therefore concluded

23  that there was no medical basis for plaintiff's headaches and rheumatoid arthritis symptoms.

24       The ALJ also gave significant weight to the opinion of the medical expert, Dr. Vu.  AR

25  34, 77-95.  On review of plaintiff's medical records, Dr. Vu testified at the hearing that since

26  plaintiff's diagnosis of and treatment for hepatitis C in 2004, there was no record of a relapse of

27  the virus.  He did note that the liver function tests are elevated, but the periods of elevation

28  generally coincide with periods of increased alcohol consumption.  Dr. Vu then referenced

1    medical records indicating the presence of lung nodules, but there was no pulmonary function test

2    performed, and he noted that plaintiff's problem could be related to the pack of cigarettes that

3    plaintiff smokes a day.  As to plaintiff's rheumatoid arthritis, the medical expert did not see any

4    deformities when looking at images of plaintiff's joints, and he testified that there were no

5    findings in the record of inflammation of the joints or any significant deformation of the joints.

6    Dr. Vu determined that there were no finding of functional limitations as to any of these physical

7    impairments, and he saw no effect on working capacity.  Dr. Vu disagreed with Dr. Chung's

8    functional assessment to the extent the latter determined that plaintiff could perform tasks such as

9    lift 100 pounds.  Dr. Vu's functional assessment of plaintiff, then, was as follows: she could sit,

10   stand and walk for up to six hours per day, and she could bend and stoop frequently but not

11   continuously.

12          Lastly, the ALJ discussed at length the record of plaintiff's substance abuse and lack of

13   candor regarding her drug use.  The ALJ referred to medical records establishing that plaintiff

14   admitted to various doctors that she purchases prescription medication "on the street" and that she

15   has used her friend's medication.  See AR 971 (nurse discussed need to not accept prescription

16   medication from friends), 994 (plaintiff admits to unauthorized use of Valium), and 997 (plaintiff

17   warned of dangers of taking others' medications).  Following one doctor's visit, during which she

18   was prescribed 20 Vicodin pills, plaintiff was admitted to an emergency room for a drug

19   overdose.  See AR 608.  In fact, plaintiff has been denied medication due to her history of opioid

20   abuse.  See, e.g., AR 608-09, 744, 748, 750, 987.  Although she frequently told medical

21   professionals that she was clean from drug use, the record establishes that she had recently used

22   methamphetamine, crack, cocaine, heroin, marijuana, opioids, and alcohol.  See, e.g., AR 639

23   (admitted to methamphetamine use in December 2008, and tested positive for opiates and

24   barbiturates in January 2009), 641 (dirty drug test on or around February 4, 2009), 678 (tested

25   positive for opiates and other drugs in May 2009), 675-76 (tested positive for opiates and other

26   drugs in October 2009), 923 (alcohol relapse on December 6, 2010), 912 (psychiatrist noted that

27   plaintiff smelled of alcohol), and 680 (admitted to smoking two marijuana joints a month).

28          For these reasons, the court finds no error with regard to the ALJ's consideration of the

14

1    medical record and medical opinions as to plaintiff's physical impairments.  Furthermore, the

2    ALJ's decision is supported by substantial evidence.  Accordingly, the court finds no error.

3           2.      Mental Impairments

4           Turning next to plaintiff's mental impairments, the ALJ found as follows:

> After careful consideration of the evidence, the undersigned finds
> that the claimant's medically determinable impairments could
> reasonably be expected to cause the alleged symptoms; however,
> the claimant's statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to the extent
> they are inconsistent with the above residual functional capacity
> assessment.   In reaching this conclusion, the undersigned has
> considered the claimant's own subjective complaints; the absence
> of medically determinable impairments which can reasonably be
> expected to produce many of her symptoms; the absence of clinical
> signs and laboratory findings in the case record that would
> substantiate the claimant's subjective complaints; the claimant's
> receipt of only routine and conservative treatment without
> reasonable or credible explanation despite complaints of disabling
> symptoms; the claimant's lack of attempts to obtain relief from pain
> and other symptoms by maintaining compliance with her
> medication regimen, stopping smoking, and abstaining from drugs
> and alcohol; the lack of consistency of claimant's subjective
> complaints throughout the medical record; the claimant's
> inconsistent work history and earnings record even several years
> prior to the alleged onset of disability; and the presence of
> acknowledged daily activities at a level fundamentally inconsistent
> with allegations of disabling symptoms.   The undersigned also
> carefully observed the claimant at what turned out to be a relatively
> lengthy hearing, and found that she demonstrated sufficient ability
> to sit, concentrate, and remember to cast doubt upon the credibility
> of her testimony.

19   AR 39.

20          a.    Dr. Viet Le

21          The court has reviewed the ALJ's decision and finds it to be supported by substantial

22   evidence.  First, the ALJ considered the opinion of treating psychiatrist, Dr. Viet Le.  Plaintiff

23   began seeing Dr. Le at SCVMC on October 17, 2008 for a meds evaluation.  AR 521.  Dr. Le's

24   notes reflect that plaintiff had a history of polysubstance dependence, beginning with a period of

25   heroin use followed by cocaine use.  Dr. Le also noted plaintiff's history of psych holds in Detroit

26   and Modesto.  Dr. Le's impression of plaintiff was that she is a woman with probable history of

27   bipolar II, PSD, and moderate mood symptoms.

28          Over the next couple of months, plaintiff was examined by Dr. Le a number of times.  On

15

1   December 3, 2008, plaintiff reported to Dr. Le worsening mood symptoms due to her housing

2   situation (she was, at the time, homeless).  AR 518.  On December 17, 2008, plaintiff reported

3   side effects with her prescribed medication and was started on another medication.  AR 513-15.

4   On January 9, 2009, plaintiff, who arrived at SCVMC with complaints of migraines and

5   rheumatoid arthritis, see AR 508-10, also told Dr. Le that the medication she was taking was

6   helpful, but that she had been off of her meds for a few days.  She wanted to try a higher dose,

7   and Dr. Le prescribed antipsychotic medication, Zyprexa and Elavil.  As to her complaints of

8   migraine headaches and rheumatoid arthritis, plaintiff walked out of the examining room after

9   being told that she would not be prescribed Vicodin due to her drug behavior.  See AR 510.

10        On January 28, 2009, plaintiff saw Dr. Le again with complaints of a cluster headache.

11  AR 504-07.  Plaintiff represented that she had been clean from drugs for one year and that her

12  current medications made her feel stable, but that recent stressors (abuse from an ex-boyfriend)

13  triggered feelings of fear.  Dr. Le noted plaintiff history of bipolar disorder and post-traumatic

14  stress disorder, which was stable on medication.  He then noted that he would prescribe Vicodin

15  for the headache, but indicated that this would "not" be a regular prescription.  AR 505 (emphasis

16  in original).  Dr. Le prescribed topiramate for mood stabilization, weight loss and headaches.

17              i.      The April 15, 2009 Medical Source Statement – Mental

18        On April 15, 2009, Dr. Le completed a Medical Source Statement – Mental.  AR 627-28.

19  There he noted that, because of plaintiff's bipolar affective disorder and PTSD, plaintiff's ability

20  to understand detailed or complex instructions was poor and her ability to follow very short and

21  simple instructions was fair.  For the same reason, he noted that her ability to carry out

22  instructions, to attend and concentrate, and to work without supervision alternated between fair

23  and poor.  As to plaintiff's ability to interact with the public, coworkers, and supervisors, Dr. Le

24  again indicated fair to poor due to her "[o]ccasional anxiety and mood lability due to illness."

25  Finally, Dr. Le determined that plaintiff's ability to adapt to change in the workplace, to be aware

26  of normal hazards and react appropriately, and to use public transportation or travel to unfamiliar

27  places was fair to poor.  Dr. Le wrote that plaintiff "recently has begun to stabilize on her

28  medications after long decompensation period.  Limited coping ability."  Dr. Le's prognosis was

16

1    "fair," and he noted that plaintiff's condition improved on medications.

2        The ALJ gave very limited weight to Dr. Le's Medical Source Statement for the following

3    reasons: (1) despite Dr. Le's opinion that plaintiff would have relatively significant limitations, he

4    noted under the prognosis section that she was improved on medications and that her condition

5    was "fair"; (2) Dr. Le failed to mention plaintiff's history of substance abuse and non-compliance

6    with medication; (3) the opinion is not consistent with Dr. Le's own treatment record, which

7    documents improvement with medication and abstinence from substance abuse; and (4) Dr. Le's

8    opinion is not fully consistent with the record as a whole.  AR 36.

9        While plaintiff is correct that a "fair" determination does not necessarily equal non-

10   disability, it was not improper for the ALJ to rely on this inconsistency as one of the many factors

11   in rejecting Dr. Le's functional limitations.  20 C.F.R. § 404.1527(c)(2) (the ALJ may consider

12   consistency with the medical record in determining the weight to give to a medical opinion).

13   Furthermore, "[i]mpairments that can be controlled effectively with medication are not disabling

14   for the purpose of determining eligibility for SSI benefits."  Warre v. Comm'r of Soc. Sec.

15   Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).  The record in this case establishes that plaintiff's

16   mental impairment can be adequately controlled by medication, and she states that the medication

17   is helpful when she is compliant.  Plaintiff argues that her non-compliance is a symptom of self-

18   sabotage, "part of the problem itself."  But the only reference to this self-sabotaging behavior is

19   Dr. Le's December 15, 2010 report, discussed infra, which plaintiff mischaracterizes.  See AR

20   783.  There, Dr. Le states only that plaintiff "consistently makes gains and then self-sabotages

21   when improving."  Id.  Dr. Le does not claim that this behavior is "part of the problem itself."

22   Thus, the court finds that the ALJ committed no error in rejecting Dr. Le's April 15, 2009 report.

23              ii.    The December 15, 2010 Mental Residual Functional

24                     Capacity Questionnaire

25       The undersigned also holds that the ALJ committed no error in rejecting Dr. Le's

26   December 15, 2010 Mental Residual Functional Capacity Questionnaire, prepared in support of

27   plaintiff's application for disability benefits.  AR 781-84.  There, Dr. Le identified plaintiff's

28   signs and symptoms, in part, as follows: impairment in impulse control, difficulty thinking or

1   concentrating, intense and unstable interpersonal relationships and impulsive and damaging

2   behavior, emotional lability, manic syndrome, paranoid thinking or inappropriate suspiciousness,

3   bipolar syndrome, and memory impairment.  As to plaintiff's ability to do unskilled work, Dr. Le

4   determined that plaintiff is seriously limited, but not precluded, regarding the following:

5   remembering work-like procedures, understanding and remembering very short and simple

6   instructions, carrying out very short and simple instructions, making simple work-related

7   decisions, asking simple questions or requesting assistance, and being aware of normal hazards

8   and taking appropriate precautions.  Dr. Le said that plaintiff's inability to control her impulses

9   and to cope and problem solve prevents her from functioning adequately in a work place setting.

10  As to plaintiff's ability to do semiskilled and skilled work, Dr. Le determined that plaintiff is

11  unable to meet competitive standards with regard to understanding and remembering detailed

12  instructions, carrying out detailed instructions, setting realistic goals, and dealing with stress of

13  work.  Dr. Le said that plaintiff is very distractible and has difficulty persisting at tasks and

14  following them to completion; her psychiatrist symptoms disrupt her concentration and impair her

15  memory; and she consistently makes gains at the clinic but she then self-sabotages when

16  improving.  Dr. Le denied that plaintiff is a malingerer and stated that plaintiff's debilitating

17  psychiatric impairments would remain if substance abuse stopped.

18         The ALJ gave very limited weight to this opinion because Dr. Le had not examined

19  plaintiff in several months; the opinion is not consistent with his own medical records, which

20  demonstrate significant improvement when compliant with medication and abstinent from

21  substance abuse; the opinion appears to be based disproportionately on plaintiff's subjective

22  record; the report is undermined by the fact that plaintiff had recently been using alcohol; and

23  lastly, Dr. Le's opinion is conclusory and not significant with the record as a whole.  These

24  constitute specific and legitimate reasons for rejecting Dr. Le's opinion.

25                 b.   Sanchez / Mahan Neuropsychological Brief Screen Report

26         The ALJ also considered and rejected the February 13, 2009 Neuropsychological Brief

27  Screen Report of psychological intern, J. Sanchez, and attending psychologist, Dr. Clara Mahan

28  ("the Sanchez / Mahan Report").  On November 18, 2009, Jennifer Sanchez, psychology intern at

SCVMC, examined plaintiff to assess her current level of cognitive and emotional functioning. AR 679-89. Ms. Sanchez initially took note of plaintiff's social and medical history, as relayed to her by plaintiff. Per Ms. Sanchez's notes, plaintiff was married in the past, though she was divorced and homeless at the time of the examination; she completed her GED and one year of junior college, receiving mostly B's and maintaining a 3.5 GPA; she was never diagnosed with a disability and denied having any learning problems; and she had been unemployed since June 2009, following her termination from a job at a supermarket for talking on her cell phone during work. Plaintiff also told Ms. Sanchez that she had an extensive history of substance abuse, but she stopped using methamphetamine, crack and cocaine abuse approximately 16 months prior to the examination. Plaintiff did admit though that she regularly takes pain medication, smokes a pack of cigarettes a day, smokes 2 marijuana joints a month, and drinks 2-3 alcoholic beverages per day.

As to her mental health problems, plaintiff reported a history of bipolar disorder and spoke of past hospitalization for delusions, hallucinations and severe agitation. Plaintiff stated that while hospitalized in 2008, she received psychiatric counseling but found it to be ineffective because she continued to use substances upon release. She asserted that her symptoms are effectively managed on medication. Plaintiff affirmed that she felt, inter alia, depressed, hopeless, and fatigued during periods of mania. She also stated that she had concentration problems, frequent crying, and sleep disturbances attributable to her menopause, which she asserted she was going through at the time of the examination.

Ms. Sanchez observed plaintiff to be oriented, casually dressed and appropriately groomed. Plaintiff's speech was normal, language was coherent, and eye contact was appropriate. Ms. Sanchez noted plaintiff to be mostly cooperative, though Ms. Sanchez also noted that plaintiff was reluctant to perform on the tasks involving memory and refused to attempt answers on the list recall test. When plaintiff became irritable and stated she was "too tired" to continue with the testing, the remainder of the test was completed five days later.

The Sanchez / Mahan Report determined that plaintiff's orientation was within normal limits; her estimate of intellectual functioning was borderline; her attention / concentration,

1   immediate memory, delayed memory, visuospatial / constructional, language, reasoning and

2   problem solving skills were variable; and lastly, her emotional functioning was deemed mildly

3   impaired.  The Report specifically noted that plaintiff's attention fluctuated and/or was impaired,

4   therefore affecting the validity of the results of the examination.

5          The Sanchez / Mahan Report noted that, although plaintiff showed improvement on

6   medication, her symptoms and behaviors persist and continue to impair her overall level of

7   functioning.  Based on the results of the testing, the Report concluded that plaintiff appears to

8   have significant cognitive impairments; however, it was unclear whether the impairments are

9   attributable to her substance abuse or are part of her bipolar disorder.  The Sanchez / Mahan

10  Report also concluded that plaintiff meets the SSI criteria for 12.04 Affective Disorders.  See AR

11  686-87.  This conclusion was based almost entirely on plaintiff's self-reports and on her

12  performance on the neuropsychological testing.

13         The ALJ gave very little weight to the Sanchez / Mahan Report because the various

14  criteria of the listing were poorly supported with generalities rather than specific cites to the

15  treatment record; Ms. Sanchez acknowledged that her testing was potentially undermined by

16  plaintiff's lack of attention and cooperation; and, lastly, Ms. Sanchez's opinion is not consistent

17  with the record as a whole.  AR 37.

18         Plaintiff contends that the ALJ erred in giving little weight to the Sanchez / Mahan Report

19  because the criteria for 12.04 Affective Disorders was supported by the results of the

20  examination, the Report states that plaintiff's impairments may have resulted in impaired

21  performances, and, lastly, the Report is consistent with the opinion of Dr. Sara Doorley.  Dr.

22  Doorley's opinion is expressed in a February 16, 2010 letter to the Disability Determination

23  Service Division of the Department of Social Services.[2]  AR 699-704.  Like the Sanchez / Mahan

24  Report, Dr. Doorley opined that plaintiff meets the SSI criteria for 12.04 Affective Disorders

25  based almost entirely on plaintiff's self-reports, though Dr. Doorley did at times refer to clinical

26  observations and the results of neuropsychological testing.  Following review of plaintiff's social

27

28  [2] This letter is also signed by Dr. Mahan.  See AR 704.

1    history, including discussion of plaintiff's tense relationships with authority figures while

2    working from 1997-2004 at the hospital and her history of substance abuse[3], Dr. Doorley

3    concluded that plaintiff's moods and behavior continue to fluctuate dramatically, greatly

4    interfering with her activities of daily living, ability to care for herself, social functioning, and

5    concentration, persistence and pace.  Dr. Doorley determined that in light of plaintiff's labile

6    moods, poor memory and decision making, low frustration tolerance, high interpersonal conflict,

7    and limited attention span and endurance, plaintiff would be unable to maintain stable and gainful

8    employment of any kind.

9         The ALJ rejected Dr. Doorley's opinion for a number of reasons, including that it

10   appeared to mirror the Sanchez / Mahan Report, it failed to discuss the effect of plaintiff's

11   substance abuse on her functioning, it was prepared in support of plaintiff's application for

12   disability benefits, and it was inconsistent with the record as a whole.  AR 37.  The ALJ also

13   determined that plaintiff's self-reports were inconsistent in the record.  For example, though

14   plaintiff claimed that she could cook if she remembered how, she also acknowledged working in

15   the homeless shelter's kitchen.  Additionally, Dr. Doorley's opinion noted that plaintiff had very

16   significant memory problems making it difficult for her to keep appointments, yet plaintiff had

17   attended many dozens of medical and mental health appointments.  Finally, plaintiff claimed that

18   she experienced many relationship problems with her family and others, but she testified at the

19   hearing that she has a very good relationship with her family and boyfriend.

20        In rejecting the Sanchez / Mahan Report and Dr. Doorley's opinion, the ALJ gave

21   significant weight to the report of consultative psychiatrist, Dr. O. Lum.  AR 37, 690-93.  Dr.

22   Lum conducted a comprehensive psychiatric evaluation of plaintiff on February 2, 2010, just two

23   weeks before Dr. Doorley prepared her letter.  Dr. Lum relied on Dr. Viet Le's medical records

24   from SCVMC and plaintiff's self-reports, in which she asserted her chief complaints as follows

25              I've been diagnosed with having bipolar and drug abuse problems.
            I've been hospitalized twice, once in Detroit when I was in my 20s
26          and in 1997 in Kaiser Stockton, California for an overdose.  I feel

27   _____

[3] With regard to her history of substance abuse, plaintiff told Dr. Doorley that she had not used
28   heroin since 1997 and methamphetamine since 2005.  AR 703.

> depression most the days [sic].  I'm angry.  I've gotten fired after working 2-1/2 months of working as a Safeway clerk.  I'm isolated. I'm fearful, and I have anxiety.  Also, at times I feel manic with insomnia and not eating for days.  I also suffer from hallucinations. I hear a voice that tells me I'm worthless.  Loss of child.  Voices when I was molested at age 13 and raped at age 16.  I'm unable to trust people at this point.

AR 690.  As to her substance abuse, plaintiff denied alcohol use and noted that she stopped heroin in 1997 and cocaine in 2007.  The mental status examination revealed normal stream of mental activity with no atypical mannerisms, polite and cooperative, and no motor or pain behaviors. Plaintiff was positive for hallucinations and paranoid delusions and her mood was noted to depressed, though her affect was adequately controlled.

Dr. Lum opined that plaintiff's problem is treatable and she can improve in 12 months. Dr. Lum's functional assessment of plaintiff was as follows: plaintiff has the ability to perform simple and repetitive tasks and detailed and complex tasks; she can accept instructions from supervisors with specific instructions to calm her mood; she can maintain regular attendance without interruptions from her psychiatric condition; and she can deal with stress in the usual workplace.  The ALJ gave significant weight to this opinion because it was consistent with the record as a whole and because plaintiff was not candid regarding her substance abuse history, leaving out her recent history of alcohol abuse, prescription drug abuse, methamphetamine abuse, and heroin abuse.

In light of Dr. Lum's opinion and the ALJ's credibility determination, discussed further infra, the court finds that the ALJ provided both specific and legitimate reasons and clear and convincing reasons for rejecting the aforementioned medical opinions, and the court further finds the ALJ's analysis and conclusion to be supported by substantial evidence.  There was no error.

C.      The ALJ's Credibility Determinations

Lastly, plaintiff contends the ALJ erred when he rejected her and her witness's credibility and testimony.

1.      Plaintiff's Credibility

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d

528, 531 (9th Cir. 1986).  When, as here, an ALJ's disbelief of a claimant's testimony is a critical factor in a decision to deny benefits, the ALJ must make explicit credibility findings.  Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990); Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981); see also Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (an implicit finding that claimant was not credible is insufficient).

Under the "Cotton test," where the claimant has produced objective medical evidence of an impairment which could reasonably be expected to produce some degree of pain and/or other symptoms, and the record is devoid of any affirmative evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of the claimant's pain and/or other symptoms only if the ALJ makes specific findings stating clear and convincing reasons for doing so.  See Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986); see also Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir.1991).  In other words, an ALJ may reject a claimant's testimony only upon "(1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so."  Benton ex. el. Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).

To determine whether a claimant's testimony regarding the severity of his symptoms is credible, the ALJ may consider, among other things, the following evidence: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; and (4) testimony from physicians and third parties concerning the nature, severity, and effect of the claimant's symptoms.  Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Smolen, 80 F.3d at 1284.  Social Security Ruling 96–7p further provides that an individual may be less credible for failing to follow prescribed treatment without cause.  Soc. Sec. Ruling 96-7p.

Here, the ALJ questioned plaintiff credibility as follows:

The claimant testified that she continues to suffer from severe arthritis symptoms, especially in regard to joints and hands. Yet, the claimant acknowledged that she was receiving no treatment for

23

1

2

3

4

5

6

7

8

9

> these symptoms.  The claimant testified that she gets tired quickly and can't focus. The claimant testified that she was terminated from Safeway due to inability to cope and remember things yet the undersigned notes that claimant admitted that she was fired from Safeway supermarkets due to using her cell phone, a clear inconsistency.  [Citation omitted.]  The claimant testified that she has many health issues with her lungs, including shortness of breath and exhaustion.  Yet, the claimant acknowledged that she continues to smoke ½ pack per day and the undersigned notes that recent records do not evidence regular complaints of respiratory problems.  The claimant testified that she has limited ability to stand, walk, and lift, yet as noted above in October 2008 the claimant reported that she was riding her bike several miles a day. There is no evidence to explain why the claimant's symptoms would have greatly worsened since that time. Also, the claimant was able to work at Safeway and work in the kitchen at her shelter.  She also acknowledged that she can do household chores.

10

11  AR 34-35.  Although plaintiff contends that the ALJ's credibility determination merely

12  regurgitates the required factors for consideration without explaining them, Pl.'s Mot. Summ. J.

13  12, the court finds the ALJ's reasoning to be sufficiently specific to be free of error.  See Thomas

14  v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (inconsistency between the claimant's

15  testimony and the claimant's conduct supported rejection of the claimant's credibility); Verduzco

16  v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (inconsistencies between claimant's testimony and

17  actions cited as a clear and convincing reason for rejecting the claimant's testimony).

18      2.    Lay Witness Testimony

19      Plaintiff also challenges the rejection of her first cousin's testimony at the hearing.  See

20  AR 106-13.  Brigitta Melendy, who stated that she spent weekends with plaintiff for the past year,

21  testified that she did not think plaintiff could do her past work because of problems with her

22  memory and her inability to work with the public.  When asked to explain what happened to

23  plaintiff since 2004, Ms. Melendy stated that plaintiff has chronic illness, fatigue, hepatitis C, and

24  migraine headaches.  The migraine headaches were so bad that plaintiff would just hold her head

25  and cry.  The witness testified that when plaintiff went to seek help for her migraines, she was

26  denied medication because she was known as a drug seeker.  She asserted that plaintiff turned to

27  drinking to cope.

28      The ALJ rejected Ms. Melendy's testimony as follows:

1
2
3
4
5
6
7
8

> The testimony of Ms. Melendy, the claimant's cousin, does not establish that the claimant is disabled.  Since Ms. Melendy is not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms, the accuracy of the testimony is questionable.  Moreover, by virtue of the relationship as the claimant's cousin, the witness cannot be considered a disinterested third party witness whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.  Most importantly, significant weight cannot be given to the witness's testimony because it is simply not consistent with the preponderance of the observations and evidence documented in the medical record.

9      AR 38.

10         Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

11    into account, unless she expressly determines to disregard such testimony and gives reasons

12    germane to each witness for doing so.  Stout v. Comm'r of Social Security Admin., 454 F.3d

13    1050,1056 (9th Cir. 2006) (citations omitted); Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001);

14    see also Robbins v. Comm'r of Social Security Admin., 466 F.3d 880, 885 (9th Cir. 2006) (ALJ

15    required to account for all lay witness testimony in discussion of findings) (citation omitted);

16    Regennitter v. Comm'r of Social Security Admin., 166 F.3d 1294, 1298 (9th Cir. 1999)

17    (testimony by lay witness who has observed claimant is important source of information about

18    claimant's impairments); Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (lay witness

19    testimony as to claimant's symptoms or how impairment affects ability to work is competent

20    evidence and therefore cannot be disregarded without comment) (citations omitted); Sprague v.

21    Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (ALJ must consider observations of non-medical

22    sources, e.g., lay witnesses, as to how impairment affects claimant's ability to work).

23         Plaintiff challenges the ALJ's reasons articulated for rejecting Ms. Melendy's testimony.

24    Specifically, plaintiff contends that the facts that she was not a medical professional and that she

25    was a relative of plaintiff's are applicable to practically all witnesses and are therefore insufficient

26    reasons to reject a lay witness.  Assuming, without deciding, that the ALJ erred in not articulating

27    more germane reasons, the undersigned finds the error to be harmless.  In Molina v. Astrue, 674

28    F.3d 1104, 1114 (9th Cir. 2010), the Ninth Circuit held that "[w]here lay witness testimony does

1   not describe any limitations not already described by the claimant, and the ALJ's well-supported

2   reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it

3   would be inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss

4   the lay witness testimony to be prejudicial per se." 674 F.3d at 1117.  In that case, the Court of

5   Appeals found that "[a]lthough the ALJ erred in failing to give germane reasons for rejecting the

6   lay witness testimony, such error was harmless given that the lay testimony described the same

7   limitations as [the claimant's] own testimony, and the ALJ's reasons for rejecting [that] testimony

8   appl[ied] with equal force to the lay testimony." Id. at 1122.  Here, because Ms. Melendy did not

9   describe any limitations not already described by plaintiff and because the undersigned already

10  found that the ALJ's credibility finding as to plaintiff was error-free, the court finds any error as

11  to the rejection of Ms. Melendy's testimony to be harmless.

12         Because the undersigned finds no error in the ALJ's reasoning and analysis, IT IS

13  ORDERED that:

14         1.  Plaintiff's motion for summary judgment is denied; and

15         2.  The Commissioner's cross-motion for summary judgment is granted.

16         3.  The Clerk is directed to enter judgment in defendant's favor.

17  DATED: November 22, 2013

18                                        _____

19                                        ALLISON CLAIRE
                                          UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28